Good morning. The third case in our docket this morning is 20-30654, Firefighters' Retmnt Sys v. Citco Grp Ltd. Counsel for Firefighters' Retmnt Sys? Thank you, Your Honor. As the court is aware, I represent the New Orleans firefighters, the Louisiana municipal workers, and the Louisiana firefighters. All are city and statewide pension plans funded by the city and parish governments. The question that has never been addressed by Citco and the district court is what case allows a 100% voting shareholder to receive an undisclosed financial benefit of $50 million from a securities offering and not be liable as a control person? There's no case law in the United States that allows a 100% controlling shareholder to receive a $50 million financial benefit and not be liable as a control person. Now, Judge Oren, as you're aware, the Dares case was recently decided, which adopted the standard of ability to control a violation. That was the same law that was in Heck, and so the question that arises is what is the ability to control a violation? It's a two-part test. Number one, what is the violation? The primary violation in this case is the receipt of the $50 million financial benefit. Now, Citco suggests that that's irrelevant to the inquiry of control, but under both Heck and Dares, you can't make the determination as to whether you can control the violation unless there's competent summary judgment evidence as to what is the violation. The $50 million benefit is essentially uncontested by the Citco defendants. It's not been contested in the appellate briefs, and for purpose of this argument, it is assumed to be $50 million. There was a big argument about whether ability to control was the standard in the Fifth Circuit, and based upon the Dares decision, that's no longer a question because the ability to control versus actual control represents the standard in the Fifth Circuit. If you refer to page 34 of our brief, there's a lot of cases starting with Enron, all the way up to the current date, that deals with the fact that you want people to exercise that control to prevent a violation because otherwise it would allow the violation to move forward. Now, what is the evidence that any of the Citco entities controls Millennium? I think you're focused on Millennium right now, right? Excuse me. Yes, sir. Well, the Citco entities control Millennium, okay? The evidence that the Citco entities control Millennium fall into the following categories. First of all, the district court held that Millennium, I mean that Citco, that Millennium was 100% subsidiary. Now, Citco would have you dismiss that and say, well, that wasn't a finding of the court. Well, it was a finding of the court, and when you look at it on a summary judgment standard, when you consider all facts favorable to us, that's the standard for looking at that. The second thing is that the offering memorandum states that it's an affiliate. The third thing is that Millennium... Let's stop on the affiliate point for a moment. Affiliate doesn't sound to me like control. It means that there's a relationship of some kind. It could be commonly controlled by some third entity. I think that that argument is there, but you got to consider it along with the other factors that I'm getting ready to list when you consider the evidence most favorable to us. The third one is that Millennium had the same address as Citco and the Kamens, and the record site for that is 32571 of the document that shows that they had the same address. But again, that sounds duplicative of the affiliate point. I get that there's a relationship between them. That's right. Other than it's a cumulative effect. Who's the parent? Who's the sub? Who's the brother and the sibling? That's right. Other than what it does, it shows a cumulative effect as I'm going through these factors to show that. The testimony of Mr. Schmeetz in the record at 360114, this is the site you had asked me about in 2019. Mr. Schmeetz says that Citco managed Millennium. Then you have the issue of the tax treatment and as a controlled foreign corporation and for them to report it as a controlled foreign corporation, they would have to know who controlled Leverage and Millennium. And Mr. Schmeetz, the president of the company does a great job of outlining why you would have to know that information. Next, you go to the acts of the agents for and Mr. Untermeyer was one of four people on the board of directors of Citco Group, who was responsible for the activities of Leverage. Now, if you look at the case that was decided by the Second Circuit Pension Committee of the University of Montreal Pension Plan, 592F608, it's a great discussion of Citco Group picking up liability from the actions of employees for Citco Group. It is precisely the same set of facts with the exception of the individual in that case is Mr. Keenan. Now, the question that the court should consider in and whether Mr. Weber was acting on behalf of the Citco Group, and there's a strong line of cases that deal with that issue. The issue goes back as far as the 1934 Act, Securities Act that has a congressional history on it 90 years ago. And this is argued at page 35 of our brief and it's the site on its house representatives number 1383 73rd Congress 1934. And it's called legally enforceable control is the concept of legally enforceable control. And 90 years ago, they knew that there was a potential for legally actual control. And they said that it could be done possibly through the use of dummies or people acting on behalf of an entity. In this particular case, and our record is very clear where we outline that in the brief is the actions of Mr. Weber and Mr. Untermeyer. And so the question becomes as to whether or not their actions on a summary judgment standard are on behalf of the Citco Group. The Montreal pension case says yes. Now, that line of cases also exists in the Fifth Circuit, starting with the case of Paul F. Newton, and that's 630 Fed Second of 1111. And the final thing is, is it James Spindler, who is the heart chair in corporate insecurities law at the University of Texas, who was our expert in the case, detailed in his report in detail why this relationship between leverage millennium and the Citco Group is one entity. And I don't think for a minute that this court is prepared to adopt a standard that you can set up a wholly owned subsidiary and act. Now, what is, in my opinion, not candid, do you really think that Citco doesn't know who owned millennium? There's a silence on behalf of Citco as to who owns it. Their argument is no evidence in the record. Well, I suggest to you is this precisely meets the summary judgment standard on those issues, and a jury can decide whether in fact that exists. But the key issue in this case is what is the violation? And this is really the ultimate control issue by the Citco Group. What is the violation? It's the nondisclosure of a $50 million benefit that was received. And in this particular case, that $50 million benefit is uncontested. They had a choice. What's the ultimate control that they exercise? They didn't have to accept the money. They didn't have to accept the money. And that's what is the ultimate control in this case. The actual control that's exercised is that they approved a stock offering by filing an amendment to the articles to approve the issuance of the preferred shares. And Mr. Weber signed that. There's no doubt that the preferred shares could not have been issued except for that affirmative act. The second thing that Mr. Untermyer did is he signed the unanimous consent for all of the existing shareholders who were getting bailed out of a bad deal. The district court suggests that that's not required. But if you look at the articles, as we cite in our brief, if a new issuance of securities doesn't rank on a parity with the old approval of the old shareholders. As to the issue of prescription that has been raised on the cross appeal, I think the first issue, the issues are fairly delineated, whether or not it's a notice inquiry, or whether you have to have notice of the particular facts that give rise to the cause of action. And the most recent case in the Fifth Circuit dealing with this is Lemieux, L-E-M-I-E-U-X 712 FedEx 409. And it says under this exception, prescription commences on the date that the party discovers or should have discovered facts upon which his cause of action is based. Our cause of action against CITCO is based upon their inability or failure to disclose the $50 million benefit that they were receiving. Now, the report of the receiver, which caused $18 million to prepare, delineates in detail the $18 million benefit that was received by the receiver. Now, the question becomes is, did the CITCO group, I mean, did the Louisiana funds have the ability to implement that type of inquiry with that expense, with no subpoena power, to discover whether CITCO took $50 million? The obvious answer to that is, is it without the subpoena power, like the trustee, you would have never found out about the use of funds and the fact that they took the money for their own personal benefit. Now, so we think the proper legal standard based on Merck is discovery of the facts given rise to the specific cause of action. And even the district court in a later decision, as we point out, came to the same conclusion in the Hunter's Run case. Now, but really the big issue here is whether or not the prescription period is extended because of fraudulent concealment. Nobody suggests that CITCO ever disclosed their use of the $50 million. And the other thing that is very important in this case is that since CITCO has decided to bring it up on a cross appeal, even though the issue wasn't decided at the district court, they have to deal with all the uncontested facts on the non-disclosure that we have starting at page 17 and page 14 of our brief. We essentially state in detail what they did not disclose. We stated in detail and they didn't contest it. And we stated they intentionally didn't do it because of the $50 million benefit. That is a classic fraudulent concealment case under both Lamont and Merck. Thank you. Counsel for the CITCO group. Thank you, Chief Judge Owen. Canon Chamagam of Paul Weiss in Washington for the CITCO Appellees. May it please the court. Now that the appellate jurisdiction issue in this case has been resolved, this court should affirm the district court's judgment on one of two alternative grounds. First, as the district court correctly concluded, none of the CITCO defendants was a control person for purposes of the Louisiana securities law because there's no genuine issue of material fact as to whether any of the defendants exercise control under any possible understanding of the correct legal standard. And second, as the district court concluded with regard to plaintiffs other claims, the claim under the Louisiana securities law is time barred because multiple events put the plaintiffs here on inquiry notice of their potential claim outside the applicable prescriptive period. And on either of those grounds, the district court's judgment should be affirmed. Let me turn first to the control person issue. As we explain in our brief, we believe that the better view is that under Louisiana law, as under the law of all of the that actual control is required. But this court has left that question open in earlier decisions, most recently in the otters case. And we respectfully submit that the court doesn't need to resolve that question now in order to affirm the district court. And I'd like to go directly to where my friend Mr. Price started and to focus on what is really the first of the three seemingly the Citgo group controlled, leveraged through millennium. And I should note at the outset that it is important to be precise here about each of the Citgo entities because there is no finding that the Citgo entities was a single business enterprise, nor does Mr. Price make that argument either in his briefs or today at oral argument. Louisiana respects the corporate forum like any other jurisdiction. And so the relevant question for purposes of this theory is did the Citgo group control millennium? And I think it's clear from Mr. Price's colloquy with Judge Ho that plaintiffs simply have no evidence of control at that level. And while plaintiffs argue at great length that millennium had control over leveraged, and we would dispute that because the undisputed evidence indicates that millennium held leveraged voting shares purely for administrative And while my friend Mr. Price refers to a finding by the district court that millennium was a subsidiary, the district court, as we have explained and as was discussed at the last oral argument in this case, simply cited no underlying support for its passing reference to the fact that millennium was a wholly owned subsidiary of the Citgo group at page 193 of the record excerpts. And elsewhere in its opinion, the district court pointed to the fact that plaintiffs had offered no evidence beyond the repeated assertion that millennium was a Citgo subsidiary. And so the only thing we have in the record here on the relationship between millennium and any of the Citgo entities is the statement in the offering materials that millennium was an affiliate of Citgo fund services. And that is certainly not enough to establish that Citgo fund services or any other entity had the ability to control millennium, much less exercised actual control. And the last thing I would say with regard to this theory is that while Mr. Price argues that we have not come forward with any case law for the proposition that a parent subsidiary relationship would be insufficient to establish control, that's actually not true. We point to the First Circuit for the proposition that mere ownership is insufficient. And I had an extended colloquy with Judge Higginson in the first argument in this case about this very point. Those cases, I think, stand for the proposition that merely being a passive owner is insufficient to give rise to a controlled person relationship. Now, again, this is an academic dispute here because Mr. Price has pointed to no evidence in the record of that sort of parent subsidiary relationship even existing. But even if it did, our submission would be that as a matter of law, that is insufficient. And so I think that the easiest way in which to resolve the control person question is to say that on plaintiff's primary factual theory here, there's simply no factual support. And I would just make one other factual point to clean up something that Mr. Smeet, a CITCO executive, that testimony does not stand for the proposition that there was a deeper relationship than a mere affiliation with CITCO. And indeed, at one point in his testimony, Mr. Smeet actually says, quote, affiliate is a big word for what the relationship was, and that's at page 36014 of the record. So to the extent that Mr. Price introduces that testimony at oral argument, I don't think that that testimony really advances the ball, and it certainly doesn't establish a relationship of control. So I think that that addresses the Millennium Theory. Let me say just a word about really all of plaintiff's other theories, but in particular, the focus on Mr. Unternaher's conduct and also on Mr. Weber's conduct. I think that once you get beyond plaintiff's theory concerning Millennium, really all of the other theories are theories of but-for causation. They're theories that CITCO entities or individuals who had affiliations with CITCO were in a position to stop the violation because they could have stopped the issuance of the series end shares from occurring. I think as a matter of law, this court's decision in Otters makes clear that that sort of theory, the theory that being in a position to prevent the violation is sufficient, is not enough even under an ability to control standards. So everything I'm about to say, I think, has to be understood against that legal principle. But just to say a word about the facts here, because I do think with respect to my friend, Mr. Price, that he blurs the facts in certain relevant respects. To go first to Mr. Unternaher. Mr. Unternaher was a member of the executive committee of the CITCO group, but his conduct, the conduct that is alleged here, is that in his capacity as the leader of the rich court group, which was an investor here, and the rich court group was a fund of funds. It was owned by a different CITCO entity. But Mr. Unternaher in his capacity as the leader of the rich court group simply procured the consents of the investors to the transaction. And leaving aside the question of whether those consents were required as a matter of law, there's no reason to believe that Mr. Unternaher here was acting in his capacity as a CITCO executive when he obtained those consents. And the most that can be said is that this is an example of but-for causation, that but for the fact that one of the investors, and it wasn't all of the investors, as Mr. Price said, but for the fact that one of the investors did not provide the consent, the transaction might not have occurred. And again, I think this court's decision in Otters makes clear that that notion, the notion that if you had done something differently, the transaction would not have occurred is insufficient. And I think that the same is true with regard to Mr. Weber. I would just make the point, as we noted in our brief, that the plaintiffs here don't rely on Mr. Weber's conduct as an independent basis in their actual argument in their brief for control person liability. But even if they did, I think that same would be said as to Mr. Weber. Mr. Weber was also a CITCO executive. He was the head of compliance at CITCO Fund Services. He did sign a resolution on behalf of Millennium that permitted the issuance of the new shares. In fact, the evidence in the record indicated that he did so at the direction of Millennium's board of directors. And again, the undisputed evidence was that notwithstanding the fact that Millennium held the shares for purposes of administrative convenience, it was the board of directors that actually exercised control over leveraged at all times. And again, I think that this theory is also subject to the vulnerability that is merely a theory of but-for causation. So again, I think that this court does not need to resolve the question of the legal standard any further than it has in Heck and Otters in order to ability to control the allegations here are simply insufficient as a matter of law. In my remaining time, and unless the court has any questions, I will stop early. I just want to address the alternative ground prescription because I think that if the court thinks that there is any difficulty with control person liability, the straightest line to an affirmance here is on the ground of prescription. Chief Judge Dick resolved the question of the applicability of the prescriptive period with regard to other of the claims in this case. She did so, for instance, with regard to the negligent misrepresentation claim at record 66-996 to 66-997. Because of the order in which she issued these summary judgment opinions, she did not address the applicability of the prescriptive period with regard to the Louisiana Securities Act claim. But really, almost all of Chief Judge Dick's reasoning applies with exactly identical force here. The only respect in which the reasoning is ever so slightly different is because the prescriptive period for this claim is two years rather than one year. And so one of the events on which she relied, the inability to redeem shares, is not relevant for purposes of this discussion. But all of the other events on which she relied, and in particular the fact that two plaintiffs received subpoenas from the SEC's Enforcement Division, and the fact that the auditor who was replaced intended to restate certain previous financial statements, would have put the plaintiffs on inquiry notice of their potential claim under any conceivable understanding of the term. And of course, we also point to the fact that there was a New York Times article reporting on allegations of rampant misconduct at Fletcher Asset Management. And of course, fund services itself had by the relevant time resigned as the administrator. And so I think for purposes of a traditional inquiry notice inquiry, those facts would have put plaintiffs on inquiry notice of the violation. And it bears underscoring here that the violation is a securities violation by Fletcher. Now, Mr. Price makes the argument that even if that was put them on notice of the fact that the CITCO entities were appropriate defendants. But I think the law is clear in Louisiana that under an inquiry notice standard, that is not required. If you have notice of the violation, you are at that point charged with conducting an investigation to identify the appropriate defendants. And we cite the Dean case from the Louisiana Supreme Court. But I think the best discussion is in the Patton case from the Louisiana Court of Appeal, where even though the plaintiffs didn't know who built the highway that gave the rise to their potential claim, they were nevertheless charged with inquiry notice. And I would note parenthetically that by plaintiffs own admission, they were certainly aware of the relationships on which they rely between leveraged and the CITCO entities, because CITCO fund services role as the administrator was obviously disclosed in the offering documents. And so I think it's somewhat ironic if the plaintiffs rely on that as a basis for avoiding prescription. I would just note very briefly two points with regard to what Mr. Price said today about prescription. First, Mr. Price relies on the Supreme Court's decision in Merck, a case with which I'm certainly familiar that required knowledge or constructive knowledge of the facts, all of the facts constituting the violation to start the period running for purposes of federal securities law. But the basis for the Supreme Court's decision in that case was the language of the relevant limitations period in federal law, which specifically refers to the facts constituting the violation. And both before and after the Supreme Court's decision in Merck, the Louisiana courts have made clear that the Louisiana courts adhere to an inquiry notice standard, which was the question before the Supreme Court for purposes of federal law in the Merck case. And in Louisiana, the doctrine of contra non volentem is a judge made rule that applies as an exception to the applicable prescriptive period. And again, the courts have been quite clear that that is a traditional inquiry notice standard. Finally, Mr. Price referred to the doctrine of fraudulent concealment. But notably, he doesn't really point to any particular act of fraudulent concealment. Instead, he simply points to omissions. But I think it's a fundamental principle of law that a mere omission is insufficient to trigger the fraudulent concealment exception to the running of a limitations period for the simple reason that if it were otherwise in every securities case based on an omission, you would have effectively an endless limitations period. So I don't think that that can be sufficient. I said finally, but there's one final point that I do want to make, which is that Mr. Price, both with regard to the control person standard and with regard to the prescriptive period, refers repeatedly to this financial benefit to, you know, a $50 million financial benefit. And he goes so far as to say that that is uncontested. But as the district court noted in its opinion, any financial interest that the CITCO entities may have had here had nothing to do with which of the CITCO entities, if any, exercised actual control or had the ability to control leverage. And in fact, if you take a look at the very page that Mr. Price cites, page 17 of his brief, where he lays out the variety of unrelated payments that he uses to come up with this $50 million number, you know, you might very well wonder why any of those payments have any significance. And in fact, the vast majority of those payments, such as the sale of the rich court group to a Fletcher affiliate, were in fact disclosed to the plaintiffs. And of course, the offering materials themselves disclose that CITCO fund services might have conflicts of interest. And so our fundamental submission here is that whatever the facts of those payments, and we do have disputes about various aspects of them, but I really don't think that they're significant here. It's just hard to see how that has anything to do with the relevant legal inquiry, which is first, whether any of the CITCO entities had exercised actual control or had the ability to control, our submission is that they did not, or whether plaintiffs were on inquiry notice of the claimed violation. And based either collectively or individually on all of the things in the public domain on which we rely, our submission is that as a matter of Louisiana law, contra non volentem simply does not enable plaintiffs to get out from under the two-year prescriptive period. They brought their claim five years after the violation and more than two years after all of the facts on which we rely were made known to plaintiffs. And so this court can on either of those grounds, and we would respectfully submit that the court do so. And unless the court has any questions, I'll yield back the remainder of my time. Thank you. Thank you, counsel. Rebuttal? First of all, the word inquiry notice does not exist in any Louisiana jurisprudence. So the suggestion by counsel that inquiry notice exists on the prescription in Louisiana is not correct. It doesn't exist. The word is never in there. You can do a Westlaw search on it. The second thing is, is that the actual language which is adopted by all the courts in Louisiana is where the cause of action is neither known or reasonably knowable by the plaintiff, even though plaintiff ignorance is not induced by the defendant. Now, the Fifth Circuit has basically said in LeMieux, as I've said, that he should have discovered all the facts upon which the claim should be based. That's the same standard that's adopted in the Merck case. Now, I find the discussion concerning the $50 million benefit to not quite be what has been argued. It hadn't been argued by the other side. And the law in this circuit, based on Hedera's, is ability to control the violation. The violation is the failure to disclose the $50 million benefit. The actual control is taking the money. The actual control is voting to issue the share so they could take the $50 million benefit. Now, let's talk about Hedera's just a minute because I'm class counsel on the other side of that case. There's no $50 million benefit in Hedera's. There's no voting control stock. And most importantly, as Judge Owens is aware, it turned on who was responsible for the valuation. In this particular case, as we point out in the offering memorandum, CITCO is responsible for valuing, along with the Board of Directors, three significant differences. And the holding of that case says that the ability to stop it standing alone, you use the word standing alone, and not with three additional factors that I just listened. Now, counsel would urge that you adopt two novel theories in the Fifth Circuit. One of called passive ownership. It does not exist as a concept in controlled personal liability. Aldridge is the First Circuit case, which is adopted by no circuits. You can do the searches of all the cases in the United States, and all the issue concerning stock ownership turns on when somebody owns less than 50%, not when they own 100%. Aldridge is an outlier case, and it's not consistent with all the Fifth Circuit cases that we've adopted on page 34 of our brief. In the 11th Circuit, our sister circuit, in Brown versus NSTAR, 8084F, Fed Third 393, they adopt the ability to control. So the suggestion that there has to be actual control exercise puts the person that has knowledge of the fraud in a position where, look, if I don't act, I don't have any liability. And I think we all know that since the controlled personal liabilities were adopted 90 years ago when the Congressional history shows legally enforceable control, the ability to control is controlled personal liability. It's said over and over again 90 years ago, and the use of dummy entities doesn't insulate somebody from liability. Sitka is essentially saying in this case, and I guess the type of business they're in in the Caribbean, you know, allows them to operate with secrecy. But you can't deny the fact that Mr. Untermyer, and we outline the scope of his activities in detail, was involved in much more than obtaining the non-consent of the shareholders. There's a litany of events that he was involved in, and he said that he was responsible for leverage in his deposition. That is precisely what the Montreal pension case dealt with with Mr. Keenan. And Mr. Keenan wasn't even on one of the four people that were the managers. I submit to you that this is a case of take the money and run. They took the money in 2008 when everything was bad, and here we are 12 years later arguing about it. Thank you, counsel. We have your argument. That will conclude the cases before the court today. We will reconvene at nine o'clock in the morning. Thank you.